IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KIMBERLY S. LONG, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-12-1446 |
| | § | |
| BDP INTERNATIONAL, INC., | § | |
| *et al.*, | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

This Fair Labor Standards Act ("FLSA") case is before the Court on Defendant BDP International, Inc.'s ("BDP") Motion for Summary Judgment [Doc. # 33] and Defendants BDP, Elite Group, Inc., Elite International Transportation, Inc., Elite Brokerage Services, Inc., and ETS Express, Inc.'s (collectively "Defendants") Motions to Dismiss and Compel Arbitration as to Opt-in Plaintiffs Norma Salas ("Salas") [Doc. # 34], Falynn Szelinski ("Szelinski") [Doc. # 50], and James Cox ("Cox") [Doc. # 51].  The Motions are fully briefed and ripe for consideration.[1]  The Court has carefully reviewed the record, the parties' arguments, and applicable law and concludes Defendant BDP's Motion for

---

[1]      Plaintiff Kimberly S. Long ("Long") filed a Response to BDP's Motion for Summary Judgment [Doc. # 57], and BDP filed a Reply [Doc. # 60].  Plaintiffs also filed a Response to Defendants' Motions to Dismiss and Compel Arbitration [Docs. # 41 and # 59], and Defendants filed Replies [Docs. # 45 and # 61].  Per the Court's order [Doc. # 65], Plaintiffs filed a Sur-reply [Doc. # 66].

Summary Judgment should be **denied**.   Defendants' Motions to Dismiss and Compel Arbitration as to Salas, Szelinski, and Cox should be **granted**.

## I.   <u>BACKGROUND</u>

In 2005, BDP acquired Elite Group, Inc., Elite International Transportation, Inc., Elite Brokerage Services, Inc., and ETS Express, Inc.'s (collectively "Elite"). Heathcock Decl. [Doc. # 33, Exh. A], at 2.[2]   Currently, Elite is a wholly owned subsidiary of BDP.   *Id.*   BDP and Elite are an integrated business enterprise that provides global logistics and transportation services for clients.   *Id.*; First Amended Complaint [Doc. # 35], at 2.

Plaintiff Long and nine Opt-in Plaintiffs ("Plaintiffs") allege that they are current and former employees who worked at Elite in Houston and who either now hold or previously held logistics coordinator, team leader, or similar positions. First Amended Complaint [Doc. # 35], at 4; *see also* Answer to First Amended Complaint [Doc. # 37], at 2-3.   According to Plaintiffs, employees holding these positions process interstate and international shipments of goods to ensure timely delivery and compliance with applicable federal regulations.   First Amended Complaint [Doc. # 35], at 4; *see also* Heathcock Depo. [Doc. # 59, Exh. A, at 4-5], at 16, 29.   Plaintiffs explain that these employees' duties include preparing bills of

---

[2]     Page numbers reference the ECF page number unless the page number appears both inside and outside the brackets.   In those cases, the page number inside the brackets is the ECF page number and the page number outside the brackets is the page number listed in the document or transcript itself.

lading, invoices, packing lists, and certifications of origin; handling letters of credit; ensuring compliance with hazardous material regulations; and arranging international transportation on ocean and air carriers.  First Amended Complaint [Doc. # 35], at 4.

It is undisputed that Long was hired on April 16, 2006, as a logistics coordinator in Houston, Texas.  *Id.* at 5; Answer to First Amended Complaint [Doc. # 37], at 3.  She was terminated on November 23, 2011.  First Amended Complaint [Doc. # 35], at 5; Answer to First Amended Complaint [Doc. # 37], at 3.  During her tenure, she alleges that she, like the other Opt-in Plaintiffs, was paid on a salary basis and scheduled to work 37.5 hours per week but routinely worked over 40 hours per week.  First Amended Complaint [Doc. # 35], at 5; Answer to First Amended Complaint [Doc. # 37], at 3.  According to Long, the additional hours were "off-the-clock," and were, uncompensated.  First Amended Complaint [Doc. # 35], at 5.

On May 9, 2012, Long brought a putative collective class action suit against Defendants alleging that Defendants violated the FLSA, 29 U.S.C. § 207, by failing to pay her and similarly situated employees overtime pay for the hours they worked over 40 hours per week.  Complaint [Doc. # 1].  Long filed her First Amended Complaint [Doc. # 35] on September 28, 2012, and her "Motion for Class Notice and for Limited Discovery" [Doc. # 54] on December 7, 2012.

Defendants have filed several motions, including those addressed in this Memorandum and Order, as well as a Motion to Dismiss Opt-in Plaintiff Paula Poteet [Doc. # 44].

## II.   MOTION FOR SUMMARY JUDGMENT

### A.   Legal Standard

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P.  56(a); *Celotex*, 477 U.S. at 322-23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349

(5th Cir. 2005).  The moving party, however, need not negate the elements of the non-movant's case.  *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).  The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'"  *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 913 (5th Cir. 1992)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial.  *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (citation omitted).  "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (citations omitted).

In deciding whether a genuine and material fact issue has been created, the Court reviews the facts and inferences to be drawn from them in the light most favorable to the non-moving party.  *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant.  *Tamez v. Manthey*, 589 F.3d 764, 769 (5th Cir. 2009) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.  *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002).  Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden.  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).  Instead, the non-moving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case."  *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (internal quotation marks and citation omitted).  In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts.  *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

The Court may make no credibility determinations, may not weigh any evidence, and must disregard all evidence favorable to the moving party that the jury is not required to believe.  *See Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage*, 336 F.3d at 412-13).  The Court is not required to accept the non-movant's conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence.  *Id.* (citing *Reaves Brokerage*, 336 F.3d at 413).

6

Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence.  *See* FED. R. CIV. P. 56(c)(4); *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Hous.*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003).   However, a party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary.  *See In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000) ("A party's self-serving and unsupported claim that she lacked the requisite intent is not sufficient to defeat summary judgment where the evidence otherwise supports a finding of fraud." (citation omitted)).

Finally, "[w]hen evidence exists in the summary judgment record but the non-movant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."  *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).  "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."  *See id*. (internal quotation marks and citations omitted).

## B.   <u>Analysis</u>

BDP asserts that summary judgment must be granted because Long, the Opt-in Plaintiffs, and all potential class members are employees of Elite, not BDP. Motion for Summary Judgment [Doc. # 33], at 2-3.  With certain exceptions not

7

here pertinent, the FLSA bars employers from employing an employee "who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(1).  The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . .," 209 U.S.C. § 203(d), and an "employee" as "any individual employed by an employer."[3]  209 U.S.C. § 203(e)(1).

The Court applies the "economic reality test" to determine whether there is an employer/employee relationship.  *Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012) (citing *Williams v. Henagan*, 595 F.3d 610, 620 (5th Cir. 2010); *Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990)); *see also Martin v. Spring Break '83 Prods., L.L.C.*, 688 F.3d 247, 251 (5th Cir. 2012).  "To determine whether an individual or entity is an employer, the court considers whether the alleged employer:  '(1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment

---

[3]  This definition has exceptions that are not applicable to the instance case.  *See* 209 U.S.C. § 203(e).

records.'"  *Gray*, 673 F.3d at 355 (quoting *Williams*, 595 F.3d at 620).  When more than one potential employer is at issue, the economic reality test is applied to each potential employer individually to determine if that individual or entity satisfies the test.  *Id.* (quoting *Watson*, 909 F.2d at 1556); *see also Martin*, 688 F.3d at 251.  The economic reality test is applied on an individual basis even if the plaintiff alleges that the potential employers were acting as a joint employer.  *Gray*, 673 F.3d at 355 (quoting *Graves*, 909 F.2d at 1556).

"The dominant theme in the case law is that those who have operating control over employees within companies may be individually liable for FLSA violations committed by the companies."  *Martin*, 688 F.3d at 251 (quoting *Gray*, 673 F.3d at 357) (internal quotation marks omitted).  Nevertheless, "[t]he doctrine of limited liability creates a strong presumption that a parent corporation is not the employer of its subsidiary's employees."  *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir. 1997) (citations omitted).  As a result, "the mere existence of common management and ownership are not sufficient to justify treating a parent corporation and its subsidiary as a single employer."  *Id.* (citations omitted).

### 1. Power to Hire and Fire

Relying on a declaration of BDP Director of Gulf and West Coast Operations Bill Heathcock ("Heathcock"), Heathcock Decl. [Doc. # 33, Exh. A], BDP contends that it did not have the power to hire or terminate employees'

9

employment. *Id.* at 2; Motion for Summary Judgment [Doc. # 33], at 10. However, Long has offered sufficient contrary evidence to raise a genuine issue of material fact regarding this prong of the economic reality test. Long's disciplinary notice bears BDP's logo and states in its description of Long's offense that corrective action was being taken in accordance with "BDP's process." Disciplinary Notice [Doc. # 58, Exh. 2], at 10. BDP warns that if no improvement is made further disciplinary action, up to and including termination, could result. *Id.* In the disciplinary notice's pre-printed text, BDP explains, in capitalized text, "if this situation is not corrected, or another offense occurs, you may be subject to further disciplinary action up to and including termination." *Id.* at 10. Like the disciplinary notice, Long's performance appraisal form bears BDP's logo. Performance Appraisal Non-Exempt [Doc. # 58, Exh. 2], at 2. Further, all individuals who work at Elite in Houston were given and required to sign BDP's employee handbook (the "Handbook"). BDP explains in the Handbook's employee acknowledgement form that the signing employee has "entered into [his or her] employment relationship with BDP International voluntarily . . . . Accordingly, BDP International or [the signing employee] can terminate the relationship at will, with or without cause, at any time, as long as there is no violation of applicable federal or state law." BDP Handbook Acknowledgement Form [Doc. # 58, Exh. 4], at 1. The Handbook also states that "[a]ny employment

agreement made by [the signing employee] and BDP International's authorized representative shall not be enforceable unless it is in writing and signed by both parties."  BDP Handbook [Doc. # 59, Exh. B], at 2.  In the "BDP International Promissory Note and Authorized Payroll deduction and re-payment" form ("Promissory Note") given to Long, it is BDP, rather than Elite, that reserved the right to discipline or terminate Long's employment if she breached the confidential nature of the arrangement.  Promissory Note [Doc. # 58, Exh. 2], at 4-5.  In fact, Long addressed her resignation letter to BDP.  Letter from Long to BDP [Doc. # 58, Exh. 1], at 22.  This evidence demonstrates the existence of a genuine issue of material fact whether BDP possessed the power to hire or terminate employees who worked at Elite.

### 2.    Control Over Work Schedules and Employment Conditions

Next, BDP argues that it has no role in supervising or controlling the work schedules of individuals who worked at Elite.  Motion for Summary Judgment [Doc. # 33], at 10.  According to BDP, Elite has its own management, employees, clients, and human resources department.  *Id*.; Heathcock Decl. [Doc. # 33, Exh. A], at 2.  Long counters with evidence that Elite's managers were subject to BDP's employees' control.  At his deposition, Heathcock testified that "as a wholly owned subsidiary, [Elite is] still subject to edicts from the corporate office."  Heathcock Depo. [Doc. # 58, Exh. 3, at 6], at 104.  Similarly, BDP's Global

Director of Human Resources Thomas Lynch ("Lynch") explained that BDP controls the activities of employees who work at Elite in Houston.[4]  Lynch Depo. [Doc. # 58, Exh. 1, at 12], at 89.  BDP also acknowledges in its briefing that it provides computer services, administrative and support services, its Handbook, and benefits to the employees at its subsidiaries.  Motion for Summary Judgment [Doc. # 33], at 3; Heathcock Decl. [Doc. # 33, Exh. A], at 2.  Moreover, BDP and Elite have the same president, vice-president, and treasurer.  Lynch Depo. [Doc. # 58, Exh. 1, at 14-21], at 116-22.

Further, BDP's Manager of Employee Relations and Training Bonnie Guistwhite, BDP's Chief Global Counsel Catherine Muldoon, Heathcock, and Lynch determined that Long was not eligible for overtime because of ***BDP's*** "OT Policy."  Lynch Depo. [Doc. # 58, Exh. 1, at 23], at 194; Note [Doc. # 58, Exh. 2], at 23. In March 2012 after Long left BDP, BDP's Vice President of Operations Kenneth Cloud ("Cloud") sent an email imposing a moratorium on all overtime at Elite.[5]  Email from Cloud to Heathcock [Doc. # 58, Exh. 2], at 24.  Cloud also

---

[4]     Lynch also testified that although BDP and Elite share a benefits group, Elite has its own payroll department and determines worker's salaries.  Lynch Depo. [Doc. # 60, Exh. 2, at 14], at 70.  Yet, he also explained that human resources personnel report to Heathcock and call Lynch for advice.  *Id.*  Because the Court must view all evidence in the light most favorable to Long, the non-movant, a fact issue remains as to the extent BDP oversees and controls Elite.  *See Reaves Brokerage*, 336 F.3d at 412.

[5]     Lynch testified that BDP's team leaders have made attempts to restrict overtime based on the amount of work needed and revenue levels but to his knowledge,

determined that company sponsored lunches at the end of each month would no longer be held at both BDP and local offices.   Email from Cloud to BDP Employees—Houston-JFK [Doc. # 58, Exh. 2], at 22; Heathcock Depo. [Doc. # 58, Exh. 3, at 4], at 24.   In addition, employee awards were given by BDP, not Elite. Outstanding Customer Service Award Winners Oct. 2008 [Doc. # 58, Exh. 2], at 12; Long Employee of the Month Certificate [Doc. # 58, Exh. 2], at 13; Descriptions of Employee Awards [Doc. # 58, Exh. 2], at 14-17.   BDP recognized Long, for example, as an Employee of the Month.   *Id.* at 13.   Some of the employees who worked at Elite were required to agree to arbitrate all employment disputes with BDP.[6]   Salas Agreement [Docs. # 34, Exh. A], at 2-3; Szelinski Agreement [Doc. # 50, Exh. A], at 1-2; Cox Agreement [Doc. # 51, Exh. A], at 1-

---

BDP's corporate management has not restricted overtime.  Lynch Depo. [Doc. # 60, Exh. 2, at 15], at 86.  Although this testimony conflicts with the evidence provided by Long, *see* Lynch Depo. [Doc. # 58, Exh. 1, at 23], at 194; Note [Doc. # 58, Exh. 2], at 23; Email from Cloud to Heathcock [Doc. # 58, Exh. 2], at 34, the Court must view the evidence in the light most favorable to Long.  *See Reaves Brokerage*, 336 F.3d at 412.

[6]  The Fifth Circuit has held that "the power to oversee dispute resolution concerning pay is not determinative of the power to make decisions regarding the rate or method of payment."  *Martin*, 688 F.3d at 251.  In *Martin*, two individuals were determined not to have controlled the rate or method of payment even though they had the authority to investigate payment-related complaints.  *Id.*  In contrast, the Agreements do not establish that BDP merely is involved in investigating or overseeing employees' disputes concerning their employment.  Instead, BDP is the employer designated in the Agreements and is the party with which all employment-related disputes must be arbitrated.  Salas Agreement [Docs. # 34, Exh. A], at 2-3; Szelinski Agreement [Doc. # 50, Exh. A], at 1-2; Cox Agreement [Doc. # 51, Exh. A], at 1-2.

2.    BDP's logo appears on the "Department Supply Lists," Doc. # 58, Exh. 2, at 19, and "Overtime Sheets," Doc. # 58, Exh. 2, at 20, used by the Elite employees. In light of the record as a whole, a genuine issue of material fact remains with regard to whether BDP had control over employee work schedules and conditions of employment.[7]

### 3.    Control Over the Rate and Method of Payment

Although Heathcock acknowledged that BDP set the budgets for Elite's operations, Heathcock Decl. [Doc. # 33, Exh. A], at 2, BDP argues that it does not control rates and methods of payment.  Motion for Summary Judgment [Doc. # 33], at 10; Reply [Doc. # 60], at 7-8.  BDP relies here on Heathcock's averment that Elite determines the method and amount of employees' pay and administers employee benefits.  Heathcock Decl. [Doc. # 33, Exh. A], at 2.  Long counters with evidence that BDP was involved in payment decisions.  In the Promissory Note signed by Long when BDP took over, BDP required her to acknowledge that she was employed by BDP and that she was authorizing BDP to deduct the requested pay advance from her salary.  Promissory Note [Doc. # 58, Exh. 2], at 4.    The

---

[7]    This conclusion is reinforced by the fact that employees who worked at Elite identified themselves as BDP employees in their emails.  In her email signature block, Human Resources Assistant Kathy Crone identified herself as an Elite Group, Inc. employee in 2006 but as a BDP employee in 2008.  Email chain among Wadkins, Cone, & Long [Doc. # 58, Exh. 2], at 8-9; Email from Cone to Elite Employees [Doc. # 58, Exh. 2], at 18.  Long also identified herself as a BDP employee in her email signature block.  Email chain among Wadkins, Cone, & Long [Doc. # 58, Exh. 2], at 8.

form contains no mention of Elite being involved in payroll.  *Id.*  Additionally, Long's direct deposit request was handled by a human resources administrator and payroll administrator who each listed BDP as her employer in her signature block. Emails between Wadkins, Cone, & Long [Doc. # 58, Exh. 2], at 8-9.  Long's "Employee Information Change Form," Doc. # 58, Exh. 2, at 6, and "Request for Direct Deposit," Doc. # 58, Exh. 2, at 7, both bear BDP's logo.  Although it is possible, as BDP contends, that BDP merely suggests policies and practices whose use is entirely at the discretion of Elite and that BDP has "no authority to set compensation, benefits, schedules, or rates or methods of payment" for employees who work at Elite, there is a genuine issue of material fact on these matters.  *See In re Enterprise*, 683 F.3d 462, 466, 471 (3rd Cir. 2012) (holding that a parent company was not an employer because its subsidiaries had full discretion whether to adopt the parent company's forms, salary ranges for employees, services, and guidelines).  BDP has not, on the current record, demonstrated as a matter of law that BDP does not control all or important aspects of Elite's employee pay rate and method of pay policies.[8]  Further, a genuine issue of material fact remains as to the

---

[8]     BDP argues that Long has not shown that BDP's decision not to pay Long overtime and the email instituting an overtime moratorium were "anything other than recommendations, suggestions, or opinions from BDP to Elite."  Reply [Doc. # 60], at 8.  However, the email and note do not contain any language suggesting that these were mere "recommendations, suggestions, or opinions."  The note states that BDP "will not be paying [Long] anytime."  Note [Doc. # 58, Exh. 2], at 23.  Cloud's email says that the "moratorium on all overtime" is "[e]ffective immediately."  Email from Cloud to Heathcock [Doc. # 58, Exh. 2], at 24.  From

involvement of BDP employees in managing payment of Elite's logistics coordinators, team leaders, or individuals holding similar positions. *See Gray*, 673 F.3d at 357 (assessing whether the potential employer determined the rate or method of payment of bartenders, the position held by the plaintiff and the co-workers on whose behalf the plaintiff brought suit).

### 4.    Maintain Employment Records

Neither party has offered sufficient evidence to establish whether BDP or Elite maintains the employment records of individuals who work at Elite in Houston.  Although BDP contends Heathcock stated in his declaration that "BDP is not the entity responsible for maintaining employment records for individuals working at Elite in Houston," Reply [Doc. # 60], at 8, in fact, Heathcock's Declaration is silent on BDP's role in maintaining employee records.  Heathcock Decl. [Doc. # 33, Exh. A], at 1-3.  On the other hand, Long states that BDP maintains employment records because forms given to individuals who worked at Elite in Houston bear BDP's logo.  Long has also offered evidence that her employee records were handled by BDP employees.  The record of Long's "Level II Outstanding Customer Service summary," Doc. # 58, Exh. 2, at 11, was sent from a BDP project administrator to a BDP global account executive, who in turn

---

this evidence, a reasonable jury could find that BDP required Elite to cease all overtime, thereby determining the rate of payment for employees who worked at Elite.  *See DIRECT TV*, 420 F.3d at 536 (citations omitted).

16

directed that it be placed in Long's personnel file.  Long's Request for Direct Deposit was handled by a BDP human resources administrator and a BDP payroll administrator.  *Id.* at 8-9.  The implications of this evidence are unclear, it may establish that BDP provided forms to Elite and handled some of Long's employee records.  This evidence is insufficient to address whether it is BDP or Elite that maintains these records.  Therefore, a genuine issue of material fact remains concerning who maintains the employees' records.

Because there are genuine issues of material fact on each element of the four-part economic reality test, the Court denies BDP's Motion for Summary Judgment asserting that BDP is not an employer of Plaintiff Long or others similarly situated to her.

## III.   <u>MOTIONS TO DISMISS AND COMPEL ARBITRATION</u>

BDP asks the Court to compel arbitration and dismiss three Opt-in Plaintiffs, Norma Salas, Falynn Szelinski, and James Cox (collectively, "Opt-in Plaintiffs"), from the case.  In response, the Opt-in Plaintiffs argue that (1) the mutual agreements to arbitrate claims (the "Agreements") they signed are invalid because the Agreements are illusory, (2) the Agreements are invalid because they are unconscionable, (3) Defendants waived their right to invoke the Agreements, and (4) they fall within an exception to the Federal Arbitration Act ("FAA").

### A.   <u>Validity of the Agreements</u>

17

### 1. Illusory

FLSA claims can be subject to arbitration. *See Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 298 (5th Cir. 2004). "Arbitration is 'a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *PaineWebber Inc. v. The Chase Manhattan Private Bank (Switzerland)*, 260 F.3d 453, 462 (5th Cir. 2001) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)). When determining whether a party should be compelled to arbitrate, the Court must first determine whether there is a valid agreement between the parties to arbitrate their particular dispute. *See Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012) (citing *JP Morgan Chase & Co. v. Conegie ex rel. Lee*, 492 F.3d 596, 598 (5th Cir. 2007)); *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004). "Answering this question requires considering two issues: '(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement.'" *Carey*, 669 F.3d at 205 (quoting *JP Morgan Chase*, 492 F.3d at 598). "[A] party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity." *Carter*, 362 F.3d at 297 (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991)). "Although there is a strong federal policy favoring arbitration, this federal policy favoring arbitration

does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Will-Drill Res., Inc. v. Samson Resources Co.*, 352 F.3d 211, 214 (5th Cir. 2003) (internal quotations and citation omitted).   In deciding whether the parties entered into a valid agreement to arbitrate, the Court applies general state law contract principles.  *Id.* at 214.   The parties agree that Texas law applies here.

Pointing to clauses in the Handbook stating that BDP may unilaterally revise the Handbook,[9] the Opt-in Plaintiffs first argue that the Agreement is unenforceable because it is illusory.   "[W]here one party to an arbitration agreement seeks to invoke arbitration to settle a dispute, if the other party can suddenly change the terms of the agreement to avoid arbitration, then the agreement was illusory from the outset."  *Carey*, 669 F.3d at 205.  Thus, when an employer "has the power to make changes to its arbitration policy that have retroactive effect, meaning changes to the policy that would strip the right of arbitration from an employee who has already attempted to invoke it, the arbitration agreement is illusory."  *Id.* (citation omitted).  Provisions in a handbook

---

[9]     In the Handbook, BDP reserves "the right to revise, supplement, or rescind any policies or portion of the Handbook as it deems appropriate, in its sole and absolute discretion."  BDP Handbook [Doc. # 59, Exh. B, at 2].  Additionally, the Handbook states that "THE PROVISIONS OF THE HANDBOOK . . . EXCEPT FOR ITS PRACTICE OF EMPLOYMENT-AT-WILL, MAY BE AMENDED OR CANCELLED AT ANYTIME, AT BDP INTERNATIONAL'S SOLE DISCRETON."  *Id.* at 5.

requiring notice and acceptance by employees of changes to the handbook are not sufficient to render an arbitration provision non-illusory.  *Id.* at 206-09.

Although BDP's Handbook contains very similar language to the employee handbook in *Carey*, the decision in that case is distinguishable because BDP's Agreements are documents completely separate from the Handbook.   The Agreements state "[t]his is the complete agreement of the parties on the subject of arbitration of disputes, except for any arbitration agreement in connection with any pension or benefit plan. . . .  No party is relying on any representations, oral or written, on the subject of the effect, enforceability or meaning of this Agreement, except as specifically set forth in this Agreement."[10]  Salas Agreement [Docs. # 34, Exh. A], at 3; Szelinski Agreement [Doc. # 50, Exh. A], at 2; Cox Agreement [Doc. # 51, Exh. A], at 2.  Arbitration provisions are enforceable when they are in a separate document that does not include language allowing unilateral changes or termination of the arbitration requirement.  *See 24 Hour Fitness USA, Inc. v. Carey*, No. H-10-3009, 2010 WL 4962813, at *2 (S.D. Tex. Dec. 1, 2010) (citations omitted), *aff'd,* 669 F.3d 202 (5th Cir. 2012); *In re 24R, Inc.*, 324 S.W.3d 564, 568 (Tex. 2010); *D.R. Horton, Inc. v. Brooks*, 207 S.W.3d 862, 868-69 (Tex.

---

[10]      Claims involving employee benefit or pension plans are exempted from the Agreements "where an employee benefit or pension plan specifies that its claims procedure shall culminate in an arbitration procedure different from this one." Salas Agreement [Doc. # 34, Exh. 1], at 2; Szelinski Agreement [Doc. # 50, Exh. A], at 1; Cox Agreement [Doc. # 51, Exh. A], at 1.

App.—Houston [14th Dist.] 2006, no pet.).  Nothing in the Agreements indicates that BDP retained the unilateral right to modify or terminate those Agreements. Therefore, they are not illusory.

### 2.    Unconscionability

An arbitration agreement may be procedurally unconscionable if the agreement or its terms are arrived at in a legally impermissible manner, or it may be substantively unconscionable if the terms of the agreement are themselves legally impermissible.  *See In re Turner Brothers Trucking Co., Inc.*, 8 S.W.3d 370, 376 (Tex. App.—Texarkana 1999, mandamus denied).   In determining whether an arbitration agreement or other contract is unconscionable, the Court examines the totality of the circumstances surrounding formation of the agreement. *See id.*   The "only cases under Texas law in which an agreement was found procedurally unconscionable involve situations in which one of the parties appears to have been *incapable* of understanding the agreement."  *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1077 (5th Cir. 2002) (emphasis added).

The Opt-in Plaintiffs first argue that the Agreements are unconscionable because they contractually impose a one-year limitation period on all claims, including claims for FLSA violations, which statutorily have either a two or three year limitations period.  Salas Response [Doc. # 41], at 4-5.  Defendants argue that the limitation is not unconscionable but, in any event, if the limitations period

21

provision is unconscionable, the provision should be severed from the Agreements.

In *Habnot v. Bay, Ltd.*, 344 F.3d 474 (5th Cir. 2003), the Fifth Circuit held that a

provision of an arbitration agreement could be severed if severing the unlawful

provision did not interfere with the ability of the arbitration agreement to achieve

its purpose of "settl[ing] any and all disputes arising out of the employment

relationship in an arbitral forum rather than a court of law." *Id.* at 478 (allowing an

unlawful provision that restricted the ability of the arbitrator to award exemplary

and punitive damages to be severed from the arbitration agreement).   Similarly,

the Texas Supreme Court has held that, "[a]n illegal or unconscionable provision

of a contract may generally be severed so long as it does not constitute the essential

purpose of the agreement." *In re Poly-Am., L.P.*, 262 S.W.3d 337, 360 (Tex. 2008)

(citations omitted) (holding that an unlawful limitation of remedies provision of an

arbitration agreement should be severed).   "The relevant inquiry is whether or not

parties would have entered into the agreement absent the unenforceable

provisions." *Id.* (citations omitted).

    The Court concludes that the one-year limitation period as applied to FLSA

claims is unconscionable.  That statute is to be construed liberally and enforced

fully.  *E.g.*, *Allen v. McWane, Inc.*, 593 F.3d 449, 452 (5th Cir. 2010) (quoting

*McGavock v. City of Water Valley, Miss.*, 452 F.3d 423, 424 (5th Cir. 2006));

*Truex v. Hearst Commc'ns, Inc.*, 96 F. Supp. 2d 652, 666 (S.D. Tex. 2000)

(Rosenthal, J.) ("The Supreme Court has stated that the provisions of the FLSA are 'remedial and humanitarian in purpose' and 'must not be interpreted or applied in a narrow, grudging manner.'" (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944), *abrogated on other grounds by* Portal-to-Portal Act, 29 U.S.C. § 254, *as recognized in IBP, Inc. v. Alvarez*, 546 U.S. 21, 26 (2005)). The Court therefore declines to bind the Opt-in Plaintiffs to the shortened limitation period and will sever that provision from the Agreements for the purposes of this case.

Moreover, severance is appropriate. There is no evidence that the parties would not have entered into the agreement absent the one-year limitations period. Indeed, the evidence is to the contrary. According to the Agreements, "[i]f any provision of this Agreement is adjudged to be void or otherwise unenforceable, in whole or in part, such adjudication shall not affect the validity of the remainder of the Agreement." Salas Agreement [Doc. # 34, Exh. A], at 3; Szelinski Agreement [Doc. # 50, Exh. A], at 2; Cox Agreement [Doc. # 51, Exh. A], at 2. This severability provision demonstrates the parties' intent to sever unconscionable provisions. *See Poly-Am*, 262 S.W.3d at 360. The limitation period provision is "'only a part of the many reciprocal promises in the agreement' and '[does] not constitute the main or essential purpose of the agreement'" to "submit their disputes to an arbitral forum rather than proceed in court." *Id.* (citation omitted).

23

In the instant case, as in *Habnot*, "the lifting of that illegal restriction enhances the ability of the arbitration provision to function fully and adequately under the law." 344 F.3d at 478.   Therefore, the Court severs the one-year limitations period provision from the Agreements for the FLSA claims brought by the Opt-in Plaintiffs.

Second, the Opt-in Plaintiffs assert that the Agreements are unconscionable because they allow BDP to recover attorneys' fees and expert fees.   Salas Response [Doc. # 41], at 5-6.   However, the Opt-in Plaintiffs misread this provision of the Agreements.   The Agreements allow an arbitrator to award attorneys' fees and other fees to a prevailing party if afforded by the statutory claim at issue.   Because the FLSA does not provide for attorneys' or other fees if an *employer* prevails, *see* 29 U.S.C. § 216(b), Defendants cannot be awarded under the Agreements attorneys' or other fees even if they prevail.

The Opt-in Plaintiffs also argue that the requirement that employees pay half of the costs of arbitration are unconscionable because those costs are greater than the expenses incurred in proceeding in federal court.   Salas Response [Doc. # 41], at 6-7.   The Court is unpersuaded.   The Agreements are governed by the Model Employment Arbitration Procedure of the American Arbitration Association (the "AAA").   Salas Agreement [Doc. # 34, Exh. A], at 2; Szelinski Agreement [Doc. # 50, Exh. A], at 1; Cox Agreement [Doc. # 51, Exh. A], at 1.   Under the AAA's

Employment Dispute Resolution Rules [Doc. # 45, Exh. A], the Opt-in Plaintiffs would be required to pay a $175 filing fee and all other costs will be borne by the employer. *Id.* at 6-7. The Supreme Court has held that "[w]here, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000). The Opt-in Plaintiffs have not met their burden to show that arbitration would likely result in prohibitively high costs for them, and this argument is rejected.

Finally, the Opt-in Plaintiffs claim that "the arbitrator might render decisions not delineated by the requirements of the FLSA." Salas Response [Doc. # 41], at 7. This contention is mere speculation and is rejected.

### B.    <u>Waiver</u>

The Opt-in Plaintiffs argue that Defendants substantially invoked the judicial process by (1) filing its motion for summary judgment two days before moving to dismiss Salas and (2) allowing Plaintiffs to take Thomas Lynch's deposition a month after Szelinski and Cox were added to the lawsuit and four days before moving to dismiss Szelinski and Cox. Szelinski & Cox Response [Doc. # 59], at 3-4. The Opt-in Plaintiffs also assert that they will be prejudiced because they have spent time and money litigating this case in a judicial forum. *Id.* at 5.

25

Although the right to arbitration can be waived like other contractual rights, "[w]aiver of arbitration is not a favored finding, and there is a presumption against it." *Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 661 (5th Cir. 1995) (quoting *Miller Brewing Co. v. Fort Worth Distrib. Co., Inc.*, 781 F.2d 494, 497 (5th Cir. 1986)) (internal quotation marks omitted); *Perry Homes v. Cull*, 258 S.W.3d 580, 584 (Tex. 2008) (citations omitted).  For there to be waiver, the party seeking to arbitrate must have "substantially invoke[d] the judicial process to the detriment or prejudice of the other party."  *Williams*, 56 F.3d at 661 (quoting *Miller Brewing*, 781 F.2d at 497) (internal quotation marks omitted); *see also Perry*, 258 S.W.3d at 595 (holding that the waiver of arbitration requires a showing of prejudice).  "Prejudice in the context of arbitration waiver refers to delay, expense, and damage to a party's legal position."  *In re Mirant Corp.*, 613 F.3d 584, 591 (5th Cir. 2010) (quoting *Nicholas v. KBR, Inc.*, 565 F.3d 904, 910 (5th Cir. 2009)) (internal quotation marks omitted); *see also Perry*, 258 S.W.3d at 597 ("[F]or purposes of a waiver of an arbitration agreement[,] prejudice refers to the inherent unfairness in terms of delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." (citations omitted)).  This includes "(1) the movant's access to information that is not discoverable in arbitration and (2) the opponent's incurring costs and fees due to the movant's actions or delay."  *Nw.*

26

*Constr. Co., Inc. v. Oak Partners, L.P.*, 248 S.W.3d 837, 849 (Tex. App.—Fort Worth 2008, pet. denied) (citing *Williams Indus., Inc. v. Earth Dev. Sys. Corp.*, 100 S.W.3d 131, 139 (Tex. App.—Houston [1st Dist.] 2003, no pet.)).  Delay or the requirement that a party pay arbitration fees cannot alone establish prejudice. *Nicholas*, 565 F.3d at 910; *Williams Indus.*, 100 S.W.3d at 139.

The Court concludes that Plaintiffs were not prejudiced.  Long and six opt-in plaintiffs (Paula Poteet, Carlos Castillo, Jeffery Sims, Phillip Auzenne, Jackie Gonzales, and Jorge Reyes, Jr.), *see* Notice of Filing of Consents [Docs. # 15, # 31, and # 32], are unaffected by Defendants' Motions to Dismiss and Compel Arbitration.  BDP's Motion for Summary Judgment impacts all Plaintiffs.  The deposition of Thomas Lynch is also relevant to all Plaintiffs.  Plaintiffs would have incurred their costs defending against the summary judgment motion or taking Lynch's deposition irrespective of the Motions to Dismiss and Compel Arbitration. Plaintiffs have offered no evidence of damage to their litigation positions or any delay.  Because Plaintiffs were not prejudiced, Defendants have not waived their right to arbitrate.

Even assuming Plaintiffs were prejudiced, Defendants did not substantially invoke the judicial process.  Salas' opt-in consent [Doc. # 31] was filed on Saturday, September 22, 2012.  BDP filed its Motion for Summary Judgment [Doc. # 33] regarding all Plaintiffs on September 25, 2012.  Defendants claim that

27

they filed their Motion to Dismiss and Compel Arbitration as to Salas upon discovering that she had signed an arbitration agreement.  Szelinski & Cox Reply [Doc. #61], at 3.  That Motion was filed on September 27, 2012, only five days after Salas joined the suit.  *See* Salas Motion [Doc. # 34].  Szelinski and Cox's opt-in consents [Doc. # 40] were filed on October 17, 2012.  On November 15, 2012, after what Plaintiffs allege was months of delay due in part to Hurricane Sandy, Plaintiffs took Lynch's deposition.  Szelinski & Cox Response [Doc. # 59], at 4. On November 19, 2012, Defendants filed their Motions to Dismiss and Compel Arbitration as to Szelinski and Cox.  Szelinkski Motion [Doc. # 50]; Cox Motion [Doc. # 51].

In *Keytrade USA, Inc. v. Ain Temouchent M/V*, 404 F.3d 891 (5th Cir. 2005), the Fifth Circuit concluded that the fact that a motion to compel arbitration was filed concurrently with a motion for summary judgment "remov[ed] any doubt as to wavier" and suggested that a motion for summary judgment filed from a defensive posture is not a substantial invocation of the judicial process.  *Id.* at 897-98.  Thus, the Court concludes that Defendants did not substantially invoke the judicial process by filing a "defensive" motion for summary judgment two days prior to filing their first Motion to Dismiss and Compel Arbitration.  In addition, the Fifth Circuit held that "a party may participate in the discovery process so long as it does not 'shower[] [the opposing party] with interrogatories and discovery

28

P:\ORDERS\11-2012\1446 MSJ compel arbitration.docx

requests.'"  *Id.* at 898 (quoting *Steel Warehouse Co., Inc. v. Abalone Shipping Ltd. of Nicosai*, 141 F.3d 234, 238 (5th Cir. 1998)).  BDP's making Lynch available to Plaintiffs for deposition at Plaintiffs' request in connection with the summary judgment motion does not constitute "showering" Plaintiffs with interrogatories and discovery requests and therefore, is not a substantial invocation of the judicial process.  BDP did not waive its right to insist on arbitration pursuant to the Agreements.

## C.   Section 1 of the Federal Arbitration Act and the Texas General Arbitration Act

The Opt-in Plaintiffs argue that they are bound to the arbitration agreements because the "transportation workers" exception to the FAA applies.  Salas Reply [Doc. # 59], at 6-7.  The FAA states, *inter alia*, that a contract "evidencing a transaction involving commerce" that contains a written provision "to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such ground as exists at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Section 1 of the FAA defines "commerce" as:

> commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, but *nothing herein contained shall apply to contracts of employment of seamen,*

> *railroad employees, or any other class of workers engaged in foreign*
> *or interstate commerce.*

9 U.S.C. § 1 (emphasis added).  The United Supreme Court has interpreted "any other class of workers engaged in foreign or interstate commerce" to apply to contracts of employment of transportation workers—workers who have a "necessary role in the free flow of goods."  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119, 121 (2001).   The Supreme Court's ruling in *Circuit City* is consistent with the Fifth Circuit's prior ruling in *Rojas v. TK Commc'ns, Inc.*, 87 F.3d 745 (5th Cir. 1996).  *Brown v. Nabors Offshore Corp*, 339 F.3d 391, 394 (5th Cir. 2003) ("We are satisfied that the Supreme Court's reading of this exemption is fully consistent with our reasoning in Rojas.").  In *Rojas*, the Fifth Circuit held that the exception "appl[ies] to employment contracts of seamen, railroad workers, and any other class of workers actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are."  87 F.3d at 748 (quoting *Asplundh Tree Expert Co. v. Bates*, 71 F.3d 592 (6th Cir. 1995)).  Said another way, "a transportation worker is someone who works in the transportation industry–an industry whose mission it is to move goods."  *Tran v. Texan Lincoln Mercury, Inc.*, No. H-07-1814, 2007 WL 2471616, at *5 (S.D. Tex. Aug. 29, 2007) (Rosenthal, J.) (holding that an employee who sells cars and arranges financing for car sales is not a transportation worker under Section 1 of the FAA).

According to Heathcock's deposition, the Opt-in Plaintiffs act as "travel

agent[s] for freight."  Heathcock Depo. [Doc. # 59, Exh. A, at 4], at 16.  Thus, Plaintiffs argue as part of the freight forwarding industry, they are engaged in the movement of goods in interstate commerce.  Szelinski & Cox Response [Doc. # 59], at 6-7; Heathcock Depo. [Doc. # 59, Exh. A, at 5], at 29.  Defendants argue that the Opt-in Plaintiffs are not engaged in work similar to seaman and railroad workers who physically transport goods and for whom, at the time Section 1 of the FAA was passed, Congress already had legislation providing for the arbitration of employee disputes.  Szelinski & Cox Reply [Doc. # 61], at 2-3; *see also Circuit City*, 532 U.S. at 121 ("By the time the FAA was passed, Congress had already enacted federal legislation providing for the arbitration of disputes between seamen and their employers.  When the FAA was adopted, moreover, grievance procedures existed for railroad employees under federal law, and the passage of a more comprehensive statute providing for the mediation and arbitration of railroad labor disputes was imminent." (internal citations omitted)).

The Court, however, need not reach the issue of whether the transportation workers exemption from Section 1 of the FAA applies.  Assuming the Opt-in Plaintiffs are transportation workers exempted by that provision, the arbitration Agreements are nevertheless enforceable under the Texas General Arbitration Act (the "TGAA").  "The mere fact that a contract affects interstate commerce, thus triggering the FAA, does not preclude enforcement under the T[G]AA as well."  *In*

*re D. Wilson Constr. Co.*, 196 S.W.3d 774, 780 (Tex. 2006); *see also Shanks v. Swift Transp. Co. Inc.*, No. L-07-55, 2008 WL 2513056, at *4 (S.D. Tex. June 19, 2008) ("[E]ven if the FAA is inapplicable, state arbitration law governs."). Because the Agreements signed by Salas [Doc. # 34, Exh. A], Szelinski [Doc. # 50, Exh. A], and Cox [Doc. # 51, Exh. A] do not specify whether the FAA or the TGAA governs the Agreements, both statutes are applicable. *See Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 98 n.64 (Tex. 2011) ("The T[G]AA and the FAA may both be applicable to an agreement, absent the parties' choice of one or the other." (citing *In re L & L Kempwood Assocs., L.P.*, 9 S.W.3d 125, 127-28 (Tex. 1999) (per curiam))); *see also Davis v. EGL Eagle Global Logistics L.P.*, 243 F. App'x 39, 44 (5th Cir. July 9, 2007); *Freudensprung v. Offshore Technical Servs. Inc.*, 379 F.3d 327, 338 n.7 (5th Cir. 2004). To compel arbitration under the TGAA, Defendants must show that the employees received notice of the binding arbitration agreement, accepted the agreement, and raise claims that fall within the scope of the agreement. *In re Dallas Peterbilt, Ltd., L.L.P.*, 196 S.W.3d 161, 162-63 (Tex. 2006) (citing *In re Oakwood Mobile Homes, Inc.*, 987 S.W.2d 571, 573 (Tex. 1999) (per curiam)). The Opt-in Plaintiffs Salas, Szelinski, and Cox each received and signed a copy of the Agreement. Salas Agreement [Docs. # 34, Exh. A]; Szelinski Agreement [Doc. # 50, Exh. A]; Cox Agreement [Doc. # 51, Exh. A]. The Agreements and the circumstances of their signing by the Opt-in Plaintiffs

meet these requirements.  Each Agreement states that BDP and the employee "mutually consent to the resolution by arbitration of all claims ("claims"), whether or not arising out of [the signing employee's] employment (or its termination), that [BDP] may have against [the signing employee] or that [the signing employee] may have against [BDP] or against its officers, directors, employees or agents in their capacity as such or otherwise."  Salas Agreement [Docs. # 34, Exh. A], at 2; Szelinski Agreement [Doc. # 50, Exh. A], at 1; Cox Agreement [Doc. # 51, Exh. A], at 1.  Further, BDP explains in the Agreements that "[t]he claims covered by this Agreement include, but are not limited to, claims for wages or other compensation due . . . and claims for violation of any federal, state, or other governmental law, statute, regulation, or ordinance, except claims excluded in the Claims Not Covered section below."  Salas Agreement [Docs. # 34, Exh. A], at 2; Szelinski Agreement [Doc. # 50, Exh. A], at 1; Cox Agreement [Doc. # 51, Exh. A], at 1.  BDP did not include a "Claims Not Covered section" in the Agreements. Salas Agreement [Docs. # 34, Exh. A], at 2-3; Szelinski Agreement [Doc. # 50, Exh. A], at 1-2; Cox Agreement [Doc. # 51, Exh. A], at 1-2.  The FLSA claims raised by the Opt-in Plaintiffs (through Long's Complaint in this suit) plainly fall within the scope of the Agreement as claims involving wages or other compensation due and claims for violation of a federal statute.

The Opt-in Plaintiffs argue that the FAA preempts the TGAA here.  The Court disagrees.  "For the FAA to preempt the TGAA, state law must refuse to enforce an arbitration agreement that the FAA would enforce, either because (1) the T[G]AA has expressly exempted the agreement from coverage, or (2) the T[G]AA has imposed an enforceability requirement not found in the FAA."  *D. Wilson Constr.*, 196 S.W.3d at 780 (internal citations omitted).  As noted hereafter, the TGAA does not exclude transportation workers or any other class of employees from its coverage.  TEX. CIV. PRAC. & REM. CODE ANN. § 171.002; *see also Davis*, 243 F. App'x at 44 (citation omitted).  Because the TGAA would enforce the arbitration agreement where the FAA potentially would not, Texas law is not preempted because it does not "refuse to enforce an arbitration agreement that the FAA would enforce."  *Davis*, 243 F. App'x at 44 (quoting D. *Wilson Constr.*, 196 S.W.3d at 780) (citing *Miller v. Pub. Storage Mgmt., Inc.*, 121 F.3d 215, 219 (5th Cir. 1997)).  Said another way, the TGAA does not "contradict the purpose of the FAA by requir[ing] a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."  *Freudensprung*, 379 F.3d at 338 n.7 (internal quotation marks and citations omitted).  Because the TGAA applies in this case, the potential bar to coverage in the FAA for transportation workers does not preclude arbitration in this case.  For the foregoing reasons, the

34

Agreements are enforceable under Texas arbitration law despite the Agreements'
potential exclusion from the FAA.

### D.    Opt-out Collective Action

Plaintiffs argue that if the Court rules that the Agreements are enforceable,
the Court should order that the arbitration proceed as an opt-out collective action
for all employees who signed the Agreements.  This issue must be addressed by the
arbitrator after an assessment of bases for the Opt-in Plaintiffs requesting an opt-
out collective action.  *See Positive Software Solutions, Inc. v. New Century Mortg.
Corp.*, 619 F.3d 458, 461-62 (5th Cir. 2010) (explaining that the court has no
procedural powers to interfere with an arbitration beyond the power to determine
whether arbitration should be compelled and whether an arbitration award should
be confirmed, vacated, or modified) (citation omitted); *Smith, Barney, Harris
Upham & Co., Inc. v. Robinson*, 12 F.3d 515, 520 (5th Cir. 1994) ("The district
court cannot interfere with an arbitration proceeding–without abusing its
discretion–if a valid arbitration agreement exists and the specific dispute falls
within the substance and scope of that agreement." (citations omitted)).  In the
primary decision relied upon by the Opt-in Plaintiffs, *Long John Silver's
Restaurants, Inc. v. Cole*, 514 F.3d 345 (4th Cir. 2008), the Fourth Circuit affirmed
the district court's decision that an arbitrator did not exceed his authority to
interpret the arbitration agreement and to certify an opt-out class action based on

35

that interpretation.  *Id.* at 352-53.  The decision did not address the merits of certifying an opt-out class or allowing a case to proceed as an opt-out collective action.  *Id.*  Furthermore, the arbitration awards cited by Plaintiffs reinforce the Court's conclusion that this issue is properly addressed by the arbitrator.  *See* Salas Response [Doc. # 41], at 10.[11]

### E.    Staying the Case

Relying on a 34-year-old case from the First Circuit, *USM Corp. v. GKN Fasteners, Ltd.*, 574 F.2d 17 (1st Cir. 1978), the Opt-in Plaintiffs request that this Court stay the case rather than dismissing the Opt-in Plaintiffs.  The cited authority is inapposite, and the Court declines this request.  The Opt-in Plaintiffs will have the opportunity to pursue their FLSA claims in arbitration, not in this Court.  There is no reason to stay this case.

---

[11]     The Opt-in Plaintiffs also argue, relying on the National Labor Relations Board's decision in *D.R. Horton, Inc.*, 357 NLRB No. 184 (Jan. 3, 2012), that class action and collective action waivers are illegal in employment arbitration agreements. However, *Horton* has been widely criticized and not followed by various of district courts.  *See Carey v. 24 Hour Fitness USA, Inc.*, No. H-10-3009, 2012 WL 4754726, at *1 (S.D. Tex. Oct. 4, 2012) (citations omitted).  *Horton* is neither binding on this Court nor owed deference.  *Id.* at *2.  In addition, *Horton* contradicts Supreme Court and Fifth Circuit precedent.  *See CompuCredit Corp. v. Greenwood*, 132 S.Ct. 655, 669 (2012); *Carter*, 362 F.3d at 298.  Finally, *Horton* itself is currently pending before the Fifth Circuit.  *D.R. Horton. v. NLRB*, No. 12-60031.

36

## IV.   CONCLUSION

For the reasons set forth above, BDP's Motion for Summary Judgment seeking dismissal from this suit because BDP is not an employer of Long and other potential Plaintiffs is denied because there are genuine issues of material fact regarding BDP's role vis-à-vis Plaintiffs in pertinent respects.  Additionally, Opt-in Plaintiffs Salas, Szelinski, and Cox are bound by their written agreements to arbitrate their disputes with BDP over wages and pay. It is therefore

**ORDERED** that Defendant BDP's Motion for Summary Judgment [Doc. # 33] arguing that BDP is not an employer of Plaintiffs is **DENIED without prejudice.**  It is further

**ORDERED** that Defendants BDP and Elite's Motion to Dismiss and Compel Arbitration as to Norma Salas [Doc. # 34], Falynn Szelinski [Doc. # 50], and James Cox [Doc. # 51] are **GRANTED.**  The FLSA claims of these Opt-in Plaintiffs may not be pursued in this Court.  To the extent these Plaintiffs are deemed parties to this case, they are **DISMISSED.**  It is further

**ORDERED** that the one-year limitation provisions in Opt-in Plaintiffs Salas, Szelinski, and Cox's arbitration agreements with BDP are **SEVERED** from those agreements.

SIGNED at Houston, Texas, this 22nd day of **January, 2013.**

Nancy F. Atlas
United States District Judge